**PLAYBOY ENTERPRISES, INC., Plaintiff,**

v.

**NETSCAPE COMMUNICATIONS CORP., Defendant.**

**Playboy Enterprises, Inc., Plaintiff,**

v.

**Excite, Inc., Defendant.**

**Nos. SA CV 99–320 AHS EEX, SA CV 99–321 AHX EEX.**

United States District Court, C.D. California, Southern Division.

June 24, 1999.

17. Counsel for both plaintiffs stated that they were prepared to accept that delay.

Barry Felder, Henry J. Silberberg, Brown Raysman Millstein Felder & Steiner, Los Angeles, CA, Jeffrey D. Neuburger, Catherine M. McGrath, Matthew D. Moren, Brown Raysman Millstein Felder & Steiner, New York, NY, for plaintiff.

Jeffrey K. Riffer, Stanley M. Gibson, Jim D. Bauch, Jeffer Mangals Butler & Marmaro, Los Angeles, CA, for defendants.

ORDER (1)DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; (2) GRANTING DEFENDANTS' REQUEST FOR JUDICIAL NOTICE; (3) ISSUING FINDINGS OF FACT AND CONCLUSIONS OF LAW

STOTLER, District Judge.

## I.

### PROCEDURAL BACKGROUND

On April 15, 1999, plaintiff Playboy Enterprises, Inc. ("PEI") filed a Motion for Preliminary Injunction against defendant Netscape Communications Corp. and against defendant Excite, Inc. On May 10, 1999, defendants filed a joint opposition. PEI filed its reply on May 17, 1999. The Court heard oral argument on the motion on May 24, 1999. At the end of the hearing, the Court took the matter under advisement, and ordered the parties to lodge proposed Findings of Fact and Conclusions of Law. Plaintiff lodged its proposed Findings on June 1, 1999; defendants lodged theirs on June 8, 1999. The Court has considered all of the parties' submissions, as well as arguments presented at the hearing.

## II.

### FACTUAL BACKGROUND

Defendants operate search engines on the Internet.[1] When a person searches for a particular topic in either search engine, the search engine compiles a list of sites matching or related to the user's search terms, and then posts the list of sites, known as "search results."

Defendants sell advertising space on the search result pages. Known as "banner ads," the advertisements are commonly found at the top of the screen. The ads themselves are often animated and whimsical, and designed to entice the Internet user to "click here." If the user does click on the ad, she is transported to the web site of the advertiser.

As with other media, advertisers seek to maximize the efficacy of their ads by targeting consumers matching a certain demographic profile. Savvy web site operators accommodate the advertisers by "keying" ads to search terms entered by users. That is, instead of posting ads in a random rotation, defendants program their servers to link a pre-selected set of banner ads to certain "key" search terms. Defendants market this context-sensitive advertising ability as a value-added service and charge a premium.

Defendants key various adult entertainment ads to a group of over 450 terms related to adult entertainment, including the terms "playboy" and "playmate." Plaintiff contends that inclusion of those terms violates plaintiff's trademarks rights in those words.

## III.

### PARTIES' CONTENTIONS

Plaintiff has a trademark on "Playboy ®" and "Playmate ®." Plaintiff contends that defendants are infringing and diluting its trademarks (1) by marketing and selling the group of over 450 words, including "playboy" and "playmate," to advertisers, (2) by programming the banner ads to run in response to the search terms "playboy" and "playmate" (i.e., "keying"), and (3) by actually displaying the banner ad on the search results page. As a result, plaintiff contends, Internet users are diverted from plaintiff's official web site and web sites sponsored or approved by plaintiff, which generally will be listed as search results, to other adult entertainment web sites. Plaintiff further argues that defendants intend to divert the users to the non-PEI sites. Plaintiff does not contend, however,

---

1. The Court notes that Netscape's search engine is co-branded with Excite, and programmed by Excite, but for purposes of this Motion, the Court treats them both as search engine operators.

that defendants infringe or dilute the marks when defendants' search engines generate a list of Web sites related to "playboy" or "playmate."

Defendants respond that while plaintiff may have a trademark on "Playboy ®" and "Playmate ®," defendants do not actually "use" the trademarks qua trademarks. Moreover, even if defendants do use the trademarks, defendants argue that a trademark does not confer an absolute property right on all uses of the protected terms, and that defendants' use of the terms is permitted. Finally, defendants dispute that they have any intent to divert users from clicking on search results (such as PEI's sites) to clicking on banner ads.

## IV.

### DISCUSSION

#### A. Legal Standard for Preliminary Injunction

 In order for plaintiff to obtain a preliminary injunction, it "must show either (1) a combination of probable success on the merits and a possibility of irreparable harm, or (2) the existence of serious questions on the merits and the balance of hardships weighing heavily in its favor." *PEI v. Welles*, 7 F.Supp.2d 1098, 1099 (S.D.Cal.1998), *aff'd without opinion*, 162 F.3d 1169, 1998 WL 750954 (9th Cir.1998).

#### B. Law and The Internet

"The Internet is 'a unique and wholly new medium of worldwide human communication.'" *Reno v. ACLU*, 521 U.S. 844, 117 S.Ct. 2329, 2334, 138 L.Ed.2d 874 (1997) (citation omitted). The parties and the Court are conversant with the workings of the Internet, as well as with the constantly expanding body of law that seeks to craft a legal contour for it. The Court is mindful of the difficulty of applying well-established doctrines to what can only be described as an amorphous situs of information, anonymous messenger of communication, and seemingly endless stream of commerce. Indeed, the very vastness, and manipulability, of the Internet forms the mainspring of plaintiff's lawsuit.

#### C. Trademark Use

 Integral to plaintiff's success on the merits of its case, on either the infringement or dilution theory, is a showing that defendants use plaintiff's trademarks in commerce. *See* Memorandum of Points & Authorities [Excite], pg. 13 (e.g., "Excite is deriving substantial and direct revenue by selling banner advertisements keyed to the PEI marks"); Memorandum of Points and Authorities [Netscape], pg. 14 (same). Plaintiff does not so show. Rather, plaintiff can only contend that the use of the words "playboy" and "playmate," as keywords or search terms, is equivalent to the use of the trademarks "Playboy ®" and "Playmate ®." However, it is undisputed that an Internet user cannot conduct a search using the trademark form of the words, i.e., Playboy ® and Playmate ®. Rather, the user enters the generic word "playboy" or "playmate." It is also undisputed that the words "playboy" and "playmate" are English words in their own right, and that there exist other trademarks on the words wholly unrelated to PEI. Thus, whether the user is looking for goods and services covered by PEI's trademarks or something altogether unrelated to PEI is anybody's guess. Plaintiff guesses that most users searching the Web for "playboy" and "playmate" are indeed looking for PEI sites, goods and services. Based on that theory, plaintiff argues that since defendants also speculate that users searching for "playboy" and "playmate" are looking for things related to Playboy ® and Playmate ®, defendants use the trademarks when they key competing adult entertainment goods and services to the generic "playboy" and "playmate."

Plaintiff has not shown that defendants use the terms in their trademark form, i.e., Playboy ® and Playmate ®, when market-

ing to advertisers or in the algorithm that effectuates the keying of the ads to the keywords. Thus, plaintiff's argument that defendants "use" plaintiff's trademarks falls short.

### D. Trademark Infringement and Dilution

Even if use of the generic "playboy" and "playmate" were construed to be use the trademark terms Playboy ® d Playmate® , plaintiff still must show that the use violates trademark law. Plaintiff has asserted two theories, trademark infringement and trademark dilution.

#### 1. Infringement

■ "The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products." *Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1391 (9th Cir.1993). Assuming arguendo that defendants' use of "playboy" and "playmate" is use of plaintiff's marks, plaintiff must still show that confusion is likely to result from that use. Plaintiff has not so shown.

■ Rather, plaintiff relies on the recent case from the Court of Appeals for the Ninth Circuit, *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1062–64 (9th Cir. 1999), for the proposition that defendants cause "initial interest confusion" by the use of the words "playboy" and "playmate." Initial interest confusion, as coined by the Ninth Circuit, is a brand of confusion particularly applicable to the Internet. Generally speaking, initial interest confusion may result when a user conducts a search using a trademark term and the results of the search include web sites not sponsored by the holder of the trademark search term, but rather of competitors. *Id.* The Ninth Circuit reasoned that the user may be diverted to an un-sponsored site, and only realize that she has been diverted upon arriving at the competitor's site. Once there, however, even though the user knows she is not in the site initially sought, she may stay. In that way, the competitor has captured the trademark holder's potential visitors or customers. *Id.*

*Brookfield* is distinguishable from this case, and where applicable, supportive of defendants' position.

First, the trademark at issue in *Brookfield* was not an English word in its own right. In *Brookfield,* the Court compared Brookfield's trademark "MovieBuff" with competitor West Coast's use of the domain name "moviebuff.com," and found them to be "essentially identical" despite the differences in capitalization, which the Court considered "inconsequential in light of the fact that Web addresses are not caps-sensitive..." *Id.* at 1054. However, the Court held that West Coast could use the term "Movie Buff" (or, presumably, "movie buff") with the space, as such is the "proper term for the 'motion picture enthusiast'.... It cannot, however, omit the space." *Id.* at 1065. On the other hand, "[i]n light of the fact that it is not a word in the English language, when the term 'MovieBuff' is employed, it is used to refer to Brookfield's products and services, rather than to mean 'motion picture enthusiast.'" *Id.* at 1065.

■ As English words, "playboy" and "playmate" cannot be said to suggest sponsorship or endorsement of either the web sites that appear as search results (as in *Brookfield*) or the banner ads that adorn the search results page. Although the trademark terms and the English language words are undisputedly identical, which, presumably, leads plaintiff to believe that the use of the English words is akin to use of the trademarks, the holder of a trademark may not remove a word from the English language merely by acquiring trademark rights in it. *Id.*

Second, the use by defendant of plaintiff's trademark in *Brookfield* was more suspect because the parties compete in the same market—as online providers of film

industry information. *See Id.,* at 1056–57 ("[n]ot only are they not non-competitors, the competitive proximity of their products is actually quite high"). The Ninth Circuit analogized the capture of unsuspecting Internet users by a competitor to highways and billboards:

> Suppose West Coast's competitor...puts up a billboard on a highway reading—"West Coast Video: 2 miles ahead at Exit 7"—where West Coast is really located at Exit 8 but Blockbuster is located at Exit 7. Customers looking for West Coast's store will pull off at Exit 7 and drive around looking for it. Unable to locate West, Coast, but seeing the Blockbuster store right by the highway entrance, they may simply rent there.

*Brookfield,* at 1064. Although the customer is not confused as to where she ultimately rents a video, Blockbuster has misappropriated West Coast's goodwill through causing initial consumer confusion. *Id.* The customer has been captured by the competitor in much the same way that defendant in *Brookfield* captures Internet users looking for plaintiff's web site.

Here, the analogy is quite unlike that of a devious placement of a road sign bearing false information. This case presents a scenario more akin to a driver pulling off the freeway in response to a sign that reads "Fast Food Burgers" to find a well-known fast food burger restaurant, next to which stands a billboard that reads: "Better Burgers: 1 Block Further." The driver, previously enticed by the prospect of a burger from the well-known restaurant, now decides she wants to explore other burger options. Assuming that the same entity owns the land on which both the burger restaurant and the competitor's billboard stand, should that entity be liable to the burger restaurant for diverting the driver? That is the rule PEI contends the Court should adopt.

## 2. Dilution

■ Trademark dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services." 15 U.S.C. § 1127. However, dilution is "not intended to serve as a mere fallback protection for trademark owners unable to prove trademark infringement." *I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 48 (1st Cir.1998).

■ To establish dilution, plaintiff must show that "(1) [defendants have] made use of a junior mark sufficiently similar to the famous mark to evoke in a relevant universe of consumers a mental association of the two that (2) has caused (3) actual economic harm to the famous mark's economic value by lessening its former selling power as an advertising agent for its goods and services." *Ringling Bros.–Barnum & Bailey Combined Shows, Inc. v. Utah Div'n of Travel Dev.,* 170 F.3d 449, 459 (4th Cir.1999). Dilution generally occurs through the blurring of a famous mark or tarnishment of the mark, but is not limited to these categories. *See Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1326 (9th Cir.1998). Plaintiff has not shown blurring of its marks, which would occur if defendants used the marks to identify defendants' goods or services. *Id.* at 1326 n. 7. First, as discussed *supra,* plaintiff has not shown that defendant use its marks Playboy ® and Playmate ®. Further, plaintiff has not presented any evidence that defendants' use of the words "playboy" and "playmate" causes any severance of the association between plaintiff and its marks Playboy ® and Playmate ®, much less in the minds of Internet users.

Plaintiff has also failed to show tarnishment, which occurs when a famous mark is associated improperly with an inferior or offensive product or service. *Id.* at 1326 n. 7. Plaintiff contends that because the content of the banner ads is more sexually explicit that PEI's content, PEI's marks are being tarnished. Again, plaintiff's argument is based on the incorrect assumption that defendants use plaintiff's marks, rather than the generic words "playboy" and "playmate." But even if the defen-

dants could be said to use plaintiff's marks, plaintiff would still be required to show that associating marks admittedly famous for adult entertainment with other purveyors of adult entertainment somehow harms plaintiff's marks. Whether PEI is a cut above the rest, as it contends, is undercut by the fact that PEI's marks are associated with other purveyors of adult entertainment in other marketing channels, as defendants' exhibits graphically establish. Adoption of plaintiff's tarnishment would secure near-monopoly control of the placement of plaintiff's marks and the associated goods and services on the Internet, where, arguably, "placement" is a nebulous concept. A greater showing of harm is required.

### V.

### CONCLUSION

Accordingly, and for the foregoing reasons, the plaintiff's motion is denied. The Court hereby adopts and issues the parties' proposed Findings of Fact and Conclusions of Law, as modified, appended hereto. The Court grants defendants' Request for Judicial Notice.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order on counsel for all parties in this action.

### I.

### FINDINGS OF FACT

*A. PEI and its Trademarks*

1. PEI is a leading publisher of adult entertainment in a variety of media forms and uses its Playboy ® and Playmate ® marks in connection with numerous products and services. PEI's magazine publications include Playboy ® MAGAZINE, which has been published since 1953 and is read by approximately 10 million people per month, as well as PEI's specialty magazines, including, but not limited to, *Playboy Presents: Video Playmates, Playboy's*

*Calendar Playmate, Playboy's International Playmates, Playboy's Playmate Review, Playboy's Playmates in the Spotlight,* and *Playboy's Playmates of the Year.* Each of PEI's magazines is marketed and distributed in interstate commerce and Playboy ® MAGAZINE is marketed and distributed internationally in 17 international editions. Declaration of Martha Lindeman, dated April 13, 1999, and submitted in support of PEI's motion to enjoin Excite ("Lindeman Decl. [Excite]") ¶ 2.

2. PEI has made substantial investments to promote its goods and services. In fiscal year 1997, PEI spent approximately $46,500,000 in advertising. That same year, PEI recorded $296,623,000 in net sales for various goods and services under the PEI Marks. *Id.* at ¶ 3.

3. PEI uses its Playboy ®and Playmate ® marks in connection with a direct marketing business, including the Playboy Catalog, cable and direct-to-home satellite television programming, videocassettes, CD–ROMS, its free Web site at www.playboy.com and its subscription-based Web site at http://cyber.playboy.com. *Id.* at ¶ 4.

4. PEI first registered its Playboy ® mark with the United States Patent and Trademark Office on December 28, 1954, under Registration No. 0600018, in connection with monthly magazines. *Id.* at ¶ 6.

5. PEI first registered its Playmate ® mark with the United States Patent and Trademark Office on September 26, 1961, under Registration No. 0721987, in connection with calendars. *Id.*

6. Thereafter, PEI registered its Playboy ® and Playmate ® marks in connection with numerous additional goods and services. Both the Playboy ® and Playmate ® marks are also registered in selected states. Each registration is valid and subsisting. Furthermore, both marks are incontestable under 15 U.S.C. § 1065 in connection with a wide variety of goods and services. *Id.*

7. Because of the duration and extent of PEI's advertising, use and publicity of the trademarks Playboy ® and Playmate ®, these trademarks have acquired significant recognition and goodwill worldwide, have become inherently distinctive and have acquired secondary meaning. This worldwide recognition has made both Playboy ® and Playmate ® famous marks which the public associates with PEI's adult entertainment goods and services. Further, consumers worldwide associate the Playboy ® and Playmate ® marks with PEI and are aware that PEI creates Playboy ® and Playmate ® products and services. *Id.* at ¶ 7.

8. Internet users logging onto the PEI Web site can, among other things, subscribe to PEI's flagship publication Playboy ®, view selected Playmate ® images and send comments and suggestions to PEI via "e-mail," PEI's electronic mail service. PEI's Web sites also include some of PEI's copyrighted images, other magazine content, upcoming Playmate ® appearances, and catalog items for sale. The Playboy Cyber Club, a subscription-only Web site, contains Playmate ® home-pages and video clips. *Id.* at ¶ 4.

9. PEI's site at http:/www.playboy.com receives approximately 6.5 million visits and generates approximately 74.8 million impressions per month. *Id.*

## B. Excite's and Netscape's Search Engine Services

10. Defendant Excite, Inc. ("Excite") operates a portal site on the World Wide Web that offers users the ability to, among other things, search the Internet using Excite's search engine. *See* Carpenter Decl., ¶¶ 2–3.

11. Defendant Netscape Communications Corp. ("Netscape") operates Netcenter, a World Wide Web portal that offers users the ability to, among other things, search the Internet using a Netscape search engine, which is co-branded with Excite and programmed by Excite. *See* Beckwith Decl., ¶¶ 2–3.

12. Because the Internet contains an almost infinite number of Web pages, Internet search engines provide a critical tool for Internet users. Without search engines, Internet users would be unable to locate all but the most obvious Web sites. *See* Carpenter Decl., ¶ 5.

13. Search engines generally use algorithms to assess the relevance of Web sites to a search query by, among other things, looking at the words used on the site. Web pages that contain the list of Web sites generated by a search engine are called the "search results pages." Soffer Decl. [Excite] ¶ 22. Some search engines look in particular for words that are invisible to the user but are nonetheless embedded in the site's software code so that the site will be picked up by search engines. Such words are called metatags. Soffer Decl. [Excite] ¶ 22; Declaration of John S. Naumann, dated May 14, 1999 ("Naumann Decl.") ¶ 9.

14. Although this case is about the use of computer technology on the Internet, and although it is about an Excite product that is made possible by an Internet user's use of the Excite search engine, the case is not literally about search engines or the use of metatags by Web sites seeking to be picked up by a search engine.

## C. Banner Advertisements

15. Many web sites, including those operated by Excite, Netscape, and PEI, contain advertisements known as "banner ads." *See* McKinley Decl., ¶ 3.

16. An Internet user who executes a search using Excite's or Netscape's search engine is presented with a Search Results page containing a variety of information, including a list of search results, recommended sites, and one or more banner advertisements. *See* R. Naumann Decl., ¶¶ 3–29.

17. The advertising product at issue here is Excite's "banner ad" product. A banner ad is an advertisement that

stretches across the top and sometimes the bottom of a Web page which contains a link to the sponsor's Web site. *Id.* at ¶ 16; Naumann Decl. ¶ 4. A user clicking on the ad will be brought to the advertiser's Web site. Soffer Decl. [Excite] ¶¶ 25, 36.

18. Some banner advertisements on Excite and Netscape are programmed to appear on the search results pages in a random or "general" rotation that is completely unrelated to the search query typed by the user. Other banner advertisements are programmed to be displayed only in response to specific search queries. For example, Honda might prefer that its banner advertisements be displayed only when a user had typed in a search query related to automobiles or cars but not when the user had typed in search terms related to gardening. *See* McKinley Decl., ¶ 4.

19. Regardless of whether a banner advertisement is displayed as part of the random "general" rotation or displayed in response to the user's search query, there is no difference in the appearance of the banner advertisement that is displayed to the user or its placement on the search results page. *See* McKinley Decl., ¶ 5.

20. In May 1998, Excite and Netscape began selling advertising inventory for banner advertisements to be displayed in response to a pre-selected package of search queries to advertisers that operate adult entertainment Web sites. The words "playboy" and "playmate" are two of the words in this package of over 450 words. If an Excite or Netscape user enters one of the over 450 words in this package, then the search results page will display a banner advertisement from one of these advertisers. Because there are several advertisers which purchased banner advertisements triggered by the search queries in this package, the banner advertisements from the various advertisers are displayed on a rotating basis. *See* McKinley Decl., ¶ 11.

21. Excite and Netscape sell banner advertisements on a "per impression" ba-

sis, *i.e.*, Excite and Netscape receive advertising revenue from displaying a banner advertisement, regardless of whether or not an Internet user "clicks" on the banner advertisement. *See* McKinley Decl., ¶ 7.

### D. Search Results Pages

22. The search results pages displayed on Excite and Netscape in response to a user's search for "playboy" or "playmate" contain a variety of information, including links to PEI's web sites, a list of search results, suggested search modifications, recommended web sites, news articles related to the search term, and one or more banner advertisements. *See* R. Naumann Decl., ¶¶ 3–29, and Exhs. 1, 3, 4, 6 thereto.

23. A user of Excite or Netscape who seeks PEI's official web sites can easily find them on the Search Results pages for "playboy" and "playmate." *See Id.*

24. The banner advertisements on the Search Results pages do not contain the words "playboy" or "playmate," nor do these advertisements claim or suggest that PEI is the source, sponsor, or affiliate of the advertisers', their web sites, or their goods or services. *See Id.*

### E. Excite and Netscape Do Not Use The Words "Playboy" or "Playmate" To Identify Goods or Services, Or To Suggest Sponsorship By Or Affiliation With PEI

25. Excite and Netscape are not competitors of PEI; Excite and Netscape offer Web portal services, while PEI publishes adult entertainment. *See* Carpenter Decl., ¶¶ 2–3; Beckwith Decl, ¶¶ 2–3; Lindeman Decl., ¶ 2. Indeed, at oral argument, PEI admitted that it was not a search engine. *See* Transcript of May 24, 1999 Hearing at p. 33.

26. Excite and Netscape do not use the words "playboy" or "playmate" to identify any goods or services. *See* R. Naumann Decl., ¶¶ 6, 9, 10, 16, 21–23, 29 and Exhs. 1, 3, 4, 6 thereto.

27. Excite and Netscape do not use PEI's "bunny" logo or any stylized lettering used by PEI. *See Id.*

28. PEI's trademarks are not search terms. Only words are search terms (and an Internet user cannot not even search "Playboy ®" or "Playmate ®"). *See* R. Naumann Decl. ¶¶ 80–83.

### F. Entities Other Than PEI Own Trademarks Containing the Words "Playboy" or "Playmate"

29. A number of entities other than PEI own federal and/or state registered trademarks containing the word "playboy" or a form thereof.[3] *See* Bauch Decl., ¶¶ 3–4, Exh. 1 thereto.

30. For example, "Playboy" is a registered federal and North Carolina trademark of W.E. Bailey & Son., Inc. for fresh yams and sweet potatoes, a registered West Virginia trademark of the Carolina Manufacturing Company, Inc. for handkerchiefs, and a registered Illinois trademark of Steven & Stanley Zavislak for soft drinks and carbonated waters. "The Penthouse Playboys" is a registered Illinois trademark of Patrick J. Michaels for musical recordings, performance, and promotion. *See Id.*

31. A number of entities other than PEI own federal and/or state registered trademarks containing the word "playmate" or a form thereof. *See Id.*, ¶ 5, Exh. 1.

32. For example, "Love Hate Playmate" is a registered federal trademark of Lynn Drexler for adult dolls. "Playmate" is a registered federal trademark of Igloo Products Corp. for beverage coolers and portable ice and/or food containers, a registered federal trademark of Agway, Inc. for grass seed, and a registered Arizona trademark of Bashas Liquor Stores for cocktail mixes. "Playmates" is a regis-

tered federal trademark of the Mohawk Carpet Corp. for carpets, a registered federal trademark of Playmate Holdings Ltd. for preschool toys, a registered federal trademark of Playmates World–Wide, Inc. for toy cars, and a registered Colorado trademark of Alan Stajcar for a striptease company. "Children's Playmate Magazine" is a registered federal trademark of Benjamin Franklin Literary & Medical Society, Inc. for a children's magazine. *See Id.*

### G. There Is No Evidence Of Confusion

33. PEI has presented no evidence of confusion.

34. PEI has not presented a consumer survey of likelihood of confusion, despite having (a) significant financial resources to pay for such a survey (in fiscal 1997, PEI had approximately $300 million in net sales and spent almost $50 million in advertising), *see* Lindeman Decl., ¶ 3, and (b) plenty of time to conduct such a survey, *see* Marhull Decl., ¶ 1 (PEI hired expert witness in November 1998, but did not move for preliminary injunction until April 1999).

35. Neither Excite nor Netscape have received any complaints or comments from consumers who believed that a banner advertisement on the Excite or Netscape search results page was a PEI advertisement or was somehow endorsed by, sponsored by or affiliated with PEI. *See* Beckwith Decl., ¶¶ 8–9; Gross Decl. ¶¶ 3–5.

36. Neither Excite nor Netscape have received any complaints or comments from consumers who were confused in any way by a banner advertisement on the Excite or Netscape search results page that resulted from a search for the words "playboy" or "playmate." *See Id.*

---

3. The Court also notes that, since trademarks are established by use, not registration, additional entities may have trademarks that contain the words "playboy" or "playmate." *See,*

*e.g., In re ECCS Inc.*, 94 F.3d 1578, 1579 (Fed.Cir.1996) (trademarks are acquired by use, not registration).

### H. There Is No Evidence of Dilution

37. PEI has presented no evidence of any lessening of the capacity of its marks to identify and distinguish goods and services as a result of any conduct by Excite and/or Netscape.

### I. PEI Uses Its Marks In Connection With Sexually Explicit Material

38. PEI's Web site (Playboy ® Online) includes banner advertisements for sexually explicit material, and offers reviews of sexually explicit Web sites. *See* R. Naumann Decl., ¶¶ 30–47, 75–77, Exhs. 7–17, 33–34 thereto.

39. PEI offers sexually explicit programming on its "Playboy Channel." *See* Annes Decl., ¶¶ 38–39.

40. PEI uses the "Playboy ®" mark on publications (including Playboy ® Magazine) that specifically instruct readers on how to find explicit sexual content on the Internet. *See* R. Naumann Decl., ¶¶ 51–64, 68–74, Exhs. 20–27, 29–32 thereto.

41. PEI's goods bearing its "Playboy ®" and "Playmate ®" marks are frequently sold and displayed near sexually explicit material of others. PEI makes no attempt to discourage or inhibit this practice. *See* Annes Decl., ¶¶ 3–35, Exhs. 1–11 thereto; Campbell Decl., ¶¶ 2–9.

### J. PEI Delayed Seeking Injunctive Relief

42. PEI retained an expert witness in November 1998, five months before filing its Motion For Preliminary Injunction. *See* Marhull Decl., ¶ 1.

## II.

## CONCLUSIONS OF LAW

### A. Jurisdiction

43. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, and 1367, and 15 U.S.C. § 1121.

44. PEI has brought claims against defendants Excite and Netscape under the United States Trademark (Lanham) Act of 1946, as amended, 15 U.S.C. §§ 1051, *et seq.* (the "Lanham Act"), which provides the Court with the power to protect PEI's trademark rights through various measures, including injunctive relief.

45. PEI has also brought claims against defendants under California common law and the California Business and Profession Code, §§ 14320 *et seq.* and 17200 *et seq.*, both of which may provide protection of trademark rights under the laws of the State of California.

### B. Standard For a Preliminary Injunction

46. A party seeking preliminary injunction "must show either (1) a combination of probable success on the merits and a possibility of irreparable harm, or (2) the existence of serious questions on the merits and the balance of hardships weighing heavily its favor." *PEI v. Welles,* 7 F.Supp.2d 1098, 1099 (S.D.Cal.), *aff'd without opinion,* 162 F.3d 1169, 1998 WL 750954 (9th Cir.1998).

47. "These are not two distinct tests, but ends of a continuum in which the required showing of harm 'varies inversely with the required showing of meritoriousness.'" *Id.*

### C. A Trademark is a Limited Property Right, Not a Monopoly

48. A trademark is a word, symbol or device which identifies the source of goods or services. *See* 15 U.S.C. § 1127 (a trademark is used by a person "to identify and distinguish his or her goods ... from those manufactured or sold by others and to indicate the source of those goods ...."); *Mattel, Inc. v. MCA Records, Inc.,* 28 F.Supp.2d 1120, 1141 (C.D.Cal.1998) ("[T]he purpose of trademark has 'remained constant and limited: Identification of the manufacturer or sponsor of a good or the provider of a service.' ").

49. A trademark is not an omnibus property right or a monopoly on the use of

the words in the trademark. *See New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302, 306 (9th Cir. 1992) ("A trademark is a limited property right in a particular word, phrase or symbol."); *see also* S.Rep.No. 1333, 79th Cong., 2d Sess. (1946) ("Trade-marks are not monopolistic grants like patents and copyrights"), cited in *Sebastian Internat'l, Inc. v. Longs Drug,* 53 F.3d 1073, 1075 n. 5 (9th Cir.1995).[4]

50. "[O]ne can capitalize on a market ... created by another provided that it is not accomplished by confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor." *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 919 (9th Cir.1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981) (defendant permitted to manufacture jewelry bearing plaintiff's mark).

51. PEI is not entitled to the entire commercial utility of the words "playboy" and "playmate." *See HMH Publishing Co., Inc. v. Brincat,* 504 F.2d 713, 717–18 (9th Cir.1974) ("[T]he mere registration of the word 'playboy' as a trademark can not entitle the registrant to capture the entire commercial utility of such a widely known concept.").[5]

52. A trademark holder may not bar all use on the Internet of words in the English language. *See Brookfield Comm. Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1066 (9th Cir.1999) ("The term 'Movie Buff' is a descriptive term, which is routinely used in the English language . . . . The proper term for the 'motion picture enthusiast' is 'Movie Buff,' which [defendant] certainly can use.").

53. There are numerous cases in the Ninth Circuit in which a defendant has been allowed to "use" plaintiff's "trademark" without plaintiff's consent.

54. For example, it is well established that a party may "use" another's trademark for purposes other than to identify the source of products. *See, e.g., PEI v. Welles,* 7 F.Supp.2d 1098, 1103 (S.D.Cal.) (former Playboy Playmate could use the words "playboy" and "playmate" in her advertising on the Internet; PEI's motion for preliminary injunction denied), *aff'd without opinion,* 162 F.3d 1169, 1998 WL 750954 (9th Cir.1998); *New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302, 309 (9th Cir.1992) (newspaper could have announcement that contained musical band's trademarked name to advertise newspapers' "900" line for public to vote for favorite members of musical band without consent of band; "the trademark laws do not give [plaintiffs] the right to channel their fans' enthusiasm (and dollars) only into items licensed or authorized by them"; summary judgment); *Mattel, Inc. v. MCA Records, Inc.,* 28 F.Supp.2d 1120, 1152 (C.D.Cal.1998) (defendant could distribute song "Barbie Girl" without consent of toy company which had "Barbie" trademark; summary judgment).

---

4. *See Bally Total Fitness Holding Corp. v. Faber,* 29 F.Supp.2d 1161, 1165 (C.D.Cal.1998) ("the average Internet user . . . will be unable to locate sites containing outside commentary [about plaintiff's goods and services] unless those sites include [plaintiff's] marks in the machine readable code upon which search engines rely."; summary judgment for defendant).

5. PEI asserts that "the essence of [its] claim in this lawsuit is that Excite [and Netscape] has hijacked and usurped PEI's good will and reputation by exploiting a search based on a PEI mark as an opportunity to run banner advertisements and display directories specifically keyed to the PEI marks." Soffer Decl.

re Excite ¶ 30 and re Netscape ¶ 31, attached to PEI's Memo. of P & As at p. 64; *see also* PEI's Complaints ¶ 29.

The Ninth Circuit has rejected this view of trademark law. *See Smith v. Chanel, Inc.,* 402 F.2d 562, 566 (9th Cir.1968) ("[Plaintiffs] argue that protection should also be extended to the trademark's commercially more important function of embodying consumer good will created through extensive, skillful, and costly advertising. The courts, however, have generally confined legal protection to the trademark's source identification function for reasons grounded in the public policy favoring a free, competitive economy.").

55. A competitor may also use another's trademark in its own advertising, as long as there is no confusion. *See SSP Ag. Equip., Inc. v. Orchard Rite Ltd.*, 592 F.2d 1096, 1103 (9th Cir.1979); *Saxony Prods., Inc. v. Guerlain, Inc.*, 513 F.2d 716, 722 (9th Cir.1975) ("'[defendant] could use [plaintiff's] trademark SHALIMAR to apprise consumers that Fragrance S is 'LIKE' or 'similar' to SHALIMAR.'"); *see also Calvin Klein Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 668 (8th Cir. 1987) (phrase "If you like OBSESSION you'll love CONFESS" did not infringe); *Penthouse v. PEI*, 663 F.2d 371, 391 (2d Cir.1981) ("No reasonable person reading Penthouse's ... advertisements could be deceived ... into believing that Penthouse magazine was the same as a copy of Playboy.").

56. An unauthorized retailer may sell trademarked products without the trademark holder's consent. *See Sebastian Internat'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1076 (9th Cir.1995) (this principle is "not rendered inapplicable merely because consumers erroneously believe the reseller is affiliated with or authorized by the producer").

57. The sale of a trademark by itself, unattached to a product, is not infringement. For example, an unauthorized jeweler may manufacture and sell jewelry encompassing another's mark without the consent of the holder of the mark. *See International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 919 (9th Cir.1980), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981).

### D. Excite and Netscape Are Not Using the Words "Playboy" Or "Playmate" As Trademarks

58. The use by Excite and Netscape of the words "playboy" and "playmate" is not a use of PEI's trademarks. The words are not used to identify the source of any goods or services. *See PEI v. Welles*, 7 F.Supp.2d 1098, 1103 (S.D.Cal.) (former Playboy Playmate could use the words "playboy" and "playmate" to advertise her Web site); *aff'd without opinion*, 162 F.3d 1169, 1998 WL 750954 (9th Cir.1998); *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302, 309 (9th Cir. 1992) (newspaper could publish announcement containing musical band's trademarked name to advertise newspaper's "900" line for public to vote for favorite members of band); *Mattel, Inc. v. MCA Records, Inc.*, 28 F.Supp.2d 1120, 1152 (C.D.Cal.1998) (distributor of song "Barbie Girl" did not need consent of toy company that owned "Barbie" trademark); *Brookfield Comm., Inc. v. West Coast Enter. Corp.*, 174 F.3d 1036, 1066 (9th Cir.1999) (holder of trademark "MovieBuff" could not bar use of the term "Movie Buff").[6]

59. This reason alone justifies denial of the injunction.

60. The Court also finds, as discussed below, that PEI has failed to produce sufficient evidence of dilution or infringement to merit injunctive relief.

### E. There Is No Evidence of Trademark Infringement

#### (1) Infringement Requires A Likelihood of Confusion

61. "The core element of trademark infringement is the likelihood of confusion, i.e. whether the similarity of the marks is likely to confuse customers about the source of the products." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir.1993).

62. The Ninth Circuit has recently recognized, in an Internet-related trademark infringement case, the doctrine of initial interest confusion. *Brookfield Comm.,*

---

**6.** PEI admits that Internet users who type in "playboy" and "playmate" as search terms are not infringing PEI's trademarks. *See* Reporter's Transcript of May 24, 1999 Hearing at p. 43 ("We're not in any way claiming that people who use the Internet, Playboy, Playmate, themselves are infringing.").

*Inc. v. West Coast Enter., Corp.,* 174 F.3d 1036, 1062-67 (9th Cir.1999).

63. This doctrine, as applied in *Brookfield,* holds that in the context of Internet searches using trademarks as search terms, Internet users may experience "initial interest confusion" when the results of their search include Web sites not sponsored by the trademark holder. *Id.* 174 F.3d at 1063-63.

64. Initial interest confusion results in trademark infringement even when the Internet user, who has been diverted to another Web site, realizes the mistake. *Id.* This diversion is damaging to a trademark owner such as PEI because it allows a competitor to capture the trademark owner's potential customers, who may decide to stay at the competitor's Web site rather than continue searching the Internet for the initially intended destination. *Id.*

65. Some people are always confused. Accordingly, to impose liability, the plaintiff must show confusion of a significant number of prospective purchasers. *See August Storck K.G. v. Nabisco Inc.,* 59 F.3d 616, 618 (7th Cir.1995); Restatement (Third) of Unfair Competition § 20, comment g (same).

66. A higher showing of confusion is appropriate where, as here, First Amendment interests are at stake. *See Mattel, Inc. v. MCA Records, Inc.,* 28 F.Supp.2d 1120, 1152 (C.D.Cal.1998) ("The First Amendment interests at stake outweigh the possibility that some people … might be confused."); Restatement (Third) of Unfair Competition § 20, comment g.

67. A higher showing of confusion is required here to prevent (a) PEI from obtaining a monopoly to the words "playboy" and "playmate"; and (b) Internet users from losing their ability to obtain

information about words which also happen to be trademarks.

68. It makes no difference which showing is applied here. PEI has failed to establish any likelihood of confusion.[7]

### (2) *PEI's Lack of Evidence of Confusion Leads to an Inference That There is No Likelihood of Confusion*

69. PEI's moving papers provided *no evidence* of actual confusion. This is significant in light of: (a) the length of time these banner advertisements have been published, *see* McKinley Decl. ¶ 11; (b) the word "playboy" is allegedly one of the most frequently-used search terms on the Internet, *see* PEI's Memo. of P & As re Netscape at p. 6, 1.9–10; (c) PEI's free Web site is allegedly one of the most visited Web sites on the Internet, *see* PEI's Memo. of P & As re Netscape at p. 5, 1.25–26; and (d) Excite and Netscape are two of the most widely-used search engines available on the Internet, *see* Soffer Decl. re Excite ¶ 31, re Netscape ¶ 32, attached to PEI's papers (in both cases).

70. Accordingly, the Court draws an inference that there is no likelihood of confusion here. *See, e.g., Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1110 (6th Cir. 1991) ("the existence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks may even lead to an inference that no likelihood of confusion exists."); *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1136 (2d Cir.1979) (" 'it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion.' "); *PEI v. Welles,* 7 F.Supp.2d 1098, 1104 (S.D.Cal.1998)

---

7. PEI's argument (unsupported by any evidence) that there is "initial interest confusion" proves too much. Under PEI's theory, as long as the defendant uses the words in plaintiff's trademark, there is "initial interest confusion." This is not the law. The "initial interest confusion" cases deal with a defendant-competitor's use of plaintiff's trademark, which is not the situation here. Further, in this case, the search results page specifically has a "link" to PEI's Web site.

("[PEI] has presented no empirical evidence to show that there is actual confusion among consumers. Though not necessary, the lack of any such demonstration weighs in defendant's favor."), *aff'd without opinion,* 162 F.3d 1169, 1998 WL 750954 (9th Cir.1998).

71. PEI also failed to provide a survey showing a likelihood of confusion. This warrants a presumption that the results would have been unfavorable. *See, e.g., Cairns v. Franklin Mint Co.,* 24 F.Supp.2d 1013, 1041–42 (C.D.Cal.1998) ("Survey evidence is not required to establish likelihood of confusion, but it is often the most persuasive evidence. Consequently, a plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so [8], may lead to an inference that the results of such a survey would be unfavorable. Here, plaintiffs had ample opportunity to conduct their own survey, and their failure to do so undermines their position that the advertisements at issue are likely to confuse consumers ....."; preliminary injunction denied); *Essence Comm., Inc. v. Singh Ind., Inc.,* 703 F.Supp. 261, 269 (S.D.N.Y.1988) ("failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown"; preliminary injunction denied).

### (3) *The First Amendment Protects the Publication of Information Regarding an Internet User's Search*

■■■ 72. Excite and Netscape's publication of value-added information to aid the searches of Internet users is protected by the First Amendment.[9] *See, e.g., New Kids,* 971 F.2d at 308 ("While plaintiffs' trademark certainly deserves protection ..., such protection does not extend to rendering newspaper articles, conversations, polls and comparative advertising

impossible."); *Cher v. Forum Internat'l,* 692 F.2d 634, 639 (9th Cir.1982) ("Constitutional protection extends to the truthful use of a public figure's name and likeness in advertising which is merely an adjunct of the protected publication.... [S]uch usage is protected by the First Amendment."); *Montana v. San Jose Mercury News, Inc.,* 34 Cal.App.4th 790, 797, 40 Cal.Rptr.2d 639 (1995) ("the First Amendment protects the [newspaper's] posters [of Joe Montana, which were sold to the public]... because the posters themselves report newsworthy items of public interest...").

### (4) *The First Amendment Protects the Publication of Advertisements Keyed to Words in the English Language*

73. Parties may not leverage their rights in certain intellectual property to infringe the First Amendment rights of others.

■■■ 74. For example, copyright protects expression. However, in situations where an idea can be expressed in only a limited number of ways (*e.g.,* (a) there is a "merger" of the idea and the expression of the idea or (b) the expression is of a common or "stock" scene, a concept known as "scenes a faire"), the First Amendment rights of others to express ideas "trump" the copyright. *See, e.g., Harper & Row v. Nation Enterp.,* 471 U.S. 539, 556, 105 S.Ct. 2218, 2228, 85 L.Ed.2d 588 (1985) ("copyright's idea/expression dichotomy 'strike[s] a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression.' ... No author may copyright his ideas or the facts he narrates."); *Allen v. Academic Games,* 89 F.3d 614, 617–18 (9th

---

**8.** PEI's own papers admit that in 1997 PEI had sales of over $290 million and it spent over $45 million in advertising. *See* Lindeman Decl. ¶ 3.

**9.** This information is entitled to even greater First Amendment protection because it is not "commercial speech." *Mattel,* 28 F.Supp.2d at 1154–55 (held, song was not commercial speech even though defendant attempted to make money).

Cir.1996) ("the notions of idea and expression may merge from such 'stock' concepts that even verbatim reproduction of a factual work may not constitute infringement.").

75. Here, PEI is seeking to leverage its trademarks "Playboy ®" and "Playmate ®" (which cannot be searched on the Internet) into a monopoly on the *words* "playboy" and "playmate." Indeed, by seeking a prohibition on all advertisements that appear in response to the search words "playboy" and "playmate," PEI would effectively monopolize the use of these words on the Internet. This violates the First Amendment rights of (a) Excite and Netscape; (b) *other* trademark holders of "playboy" and "playmate"; as well as (c) members of the public who conduct Internet searches.[10] *See generally See Bally Total Fitness Corp. v. Faber*, 29 F.Supp.2d 1161, 1165 (C.D.Cal.1998) ("prohibiting [defendant] from using [plaintiff's] name in the machine readable code would effectively isolate him from all but the most savvy of Internet users").

### (5) *To The Extent The Eight–Factor Test For Likelihood of Confusion Is Applicable, It Favors Excite and Netscape*

76. Some courts invoke an eight factor test [11] for determining likelihood of confusion. The Ninth Circuit, however, has noted that such a test is "pliant", some factors are more important than others and the relative importance of the factors is "case-specific." *Brookfield Comm.*, 174 F.3d 1036, 1053.

77. Those eight factors have been applied where a defendant's advertising con-tains plaintiff's mark. But, such is not the case here. Therefore, these factors do not apply.

78. Excite and Netscape are not using a PEI trademark. PEI uses the words "playboy" and "playmate" as trademarks, *i.e.*, to identify its products. Internet users search for the *words* "playboy" and "playmate"; and Excite and Netscape use the *words* "playboy" and "playmate" in their search engines. Netscape and Excite do *not* use these words to identify any goods or services and have no intent to do so, much less an intent to confuse consumers. *See Toho Co., Ltd. v. Sears, Roebuck & Co.*, 645 F.2d 788, 791 n. 2 (9th Cir.1981) ("[An earlier] court erred when it assumed that an intent to 'capitalize' [on another's trademark] was enough [for trademark infringement]. In order to raise the inference of a likelihood of confusion, a plaintiff must show that the defendant intended to profit by confusing consumers."). Further, none of the banner advertisements contain PEI's marks and there is no evidence that any customer believes that the advertisements are sponsored or affiliated with PEI. Thus, the eight factor test is not applicable.

79. In any event, the factors in this test are either inapplicable or favor Excite and Netscape.

### (a) *The First and Third Factors Are Inapplicable*

80. Because Excite and Netscape do not use the words "playboy" and "playmate" as trademarks, *i.e.* they do not use them to identify goods or services, the

---

10. Where, as here, other important social policies may conflict with trademark law, those policies triumph. *See, e.g., Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165, 115 S.Ct. 1300, 1304, 131 L.Ed.2d 248 (1995) (" '[A] product feature is functional' and cannot serve as a trademark 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.' "); *I.P. Lund Trading*, 163 F.3d at 39 (1st Cir.1998) ("even if a functional feature has achieved secondary meaning as an indication of origin, that fea-

ture is not protectable under trademark" law).

11. The eight factors are: (1) strength of mark; (2) proximity of the goods; (3) similarity of the marks; (4) actual confusion; (5) similarity of the marketing channels; (6) degree of care used by the consumer; (7) defendant's intent; and (8) likelihood of expansion of product lines. *See Bally Total Fitness Corp. v. Faber*, 29 F.Supp.2d 1161, 1163 (C.D.Cal.1998).

"strength of mark" and "similarity of marks" factors are inapplicable.

### (b) *The Second, Fifth, Sixth, and Eighth Factors Are Inapplicable*

81. Similarly, the "proximity of goods," "similarity of marketing channels," "degree of purchaser care," and "likelihood of expansion of product line" factors are inapplicable because Excite and Netscape do not compete with PEI and do not use PEI's marks to identify goods or services, nor do they plan to do so.

### (c) *The Fourth Factor Favors Excite and Netscape*

82. Given the length of time these banner advertisements have been published, the lack of any evidence of actual confusion weighs in Excite's and Netscape's favor. *See PEI v. Welles,* 7 F.Supp.2d 1098, 1104 (S.D.Cal.) ("[PEI] has presented no empirical evidence to show that there is actual confusion among consumers. Though not necessary, the lack of any such demonstration weighs in defendant's favor."), *aff'd without opinion,* 162 F.3d 1169, 1998 WL 750954 (9th Cir.1998); *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1110 (6th Cir. 1991); *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1136 (2d Cir.1979).

### (d) *The Seventh Factor Favors Excite and Netscape*

83. The "intent" factor focuses on a defendant's intent to confuse consumers. *See Toho Co., Ltd. v. Sears, Roebuck & Co.,* 645 F.2d 788, 791 n. 2 (9th Cir.1981) ("[A] plaintiff must show that the defendant intended to profit by confusing consumers."). PEI has presented no evidence that Excite or Netscape intend to confuse users of their search engines. Excite and Netscape charge their advertisers according to the number of times a banner advertisement is displayed to users, regardless of how many users "click" on the banner ad. Therefore, this factor weighs in favor of Excite and Netscape.

### (e) *Conclusion: There Is No Likelihood of Confusion*

84. There is no evidence that the banner advertisements on Excite's and Netscape's Search Results pages "keyed" to the words "playboy" or "playmate" are likely to cause confusion as to source, sponsorship, or affiliation.

### (6) *In the Alternative, Excite's and Netscape's Use of the Words "Playboy" and "Playmate" Is Protected Fair Use*

85. A trademark holder may not prevent the use of words necessary to communicate ideas. *See New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302, 308 (9th Cir.1992) (newspaper could use trademarked name of musical band to identify band); *see also Mattel,* 28 F.Supp.2d at 1142; *Welles,* 7 F.Supp.2d at 1103 (traditional eight factor test should only be applied in "standard" trademark case); *Brookfield Comm., Inc. v. West Coast Enter. Corp.,* 174 F.3d 1036, 1066 (9th Cir.1999) (holder of trademark "MovieBuff" could not prevent defendant from using the term "Movie Buff" to describe its web site).

86. This fair use test generally has three factors: (a) the product must be one not readily identifiable without the use of the trademark (*e.g.,* someone wanting to refer to the Chicago Bulls can use those words and does not need to go through the linguistic gymnastics of calling the team "the formerly successful professional basketball team in Chicago"); (b) only so much of the mark may be used as is reasonably necessary; and (c) the user must do nothing in conjunction with the mark to suggest sponsorship or endorsement.

87. The first factor does not apply. The words "playboy" and "playmate" are being used as words in the English language and not as trademarks to identify a product or service. There should be no liability for that reason. *See generally Bada Co. v. Montgomery Ward & Co.,* 426

F.2d 8, 11 (9th Cir.1970), *cert. denied,* 400 U.S. 916, 91 S.Ct. 174, 27 L.Ed.2d 155 (1970) ("The law is that a word which is in its primary meaning merely descriptive of the goods to which it is applied may not be appropriated as the exclusive trademark of a single seller, since one competitor will not be permitted to impoverish the language of commerce by preventing his fellows from fairly describing their own goods.").

88. The other two factors apply here: (a) there is a limited use of the mark, *e.g.,* there is no use of any stylized letters or any bunny logo; and (b) there is no suggestion of sponsorship or endorsement.

89. Indeed, the Ninth Circuit recently held that a defendant may use words in the English language, even if they are substantially similar to another's trademark, in a meta-tag on the Internet; the Court only prohibited the use of another's trademark where the words in the trademark were not in the English language. *See Brookfield Comm. Inc. v. West Coast Enter. Corp.,* 174 F.3d 1036, 1066 (9th Cir.1999) ("The term 'Movie Buff' is a descriptive term[20], which is routinely used in the English language ....'MovieBuff' [which is plaintiff's trademark] is not.... The proper term for the 'motion picture

---

**20.** A mark is used descriptively when it is not being used as a trademark, *i.e.,* it is not being used to identify the source of goods. This has nothing to do with whether the mark is categorized as descriptive in the hierarchy of trademark law (i.e., whether a mark is generic, descriptive, suggestive, arbitrary or fanciful). *See Car–Freshner Corp. v. S.C. Johnson & Son, Inc.,* 70 F.3d 267, 269 (2d Cir.1995).

**21.** PEI's argument that a trademark owner is entitled to protect English language words where those words have attained secondary meaning is beside the point.

Trademark owners can never take words out of the English language. Trademark owners may keep defendants from using their trademarks with goods and services where the words in the trademarks have secondary meaning and there is a likelihood of confusion or dilution with *those* goods and services. *See* 2 J. McCarthy, Trademarks and Unfair Competition § 15:6 (4th ed.1999).

---

enthusiast' is 'Movie Buff,' which [defendant] certainly can use.").

90. In short, because Excite and Netscape use the words "playboy" and "playmate" as words in the English language rather than as trademarks,[21] and do not use any stylized letters or logo, or in any other way suggest sponsorship or endorsement by PEI, Excite's and Netscape's use of the words is fair use.

91. The Ninth Circuit recently affirmed the denial of PEI's attempt to enjoin a former Playboy Playmate from advertising on the Internet that she is a former Playboy Playmate. *See PEI v. Welles,* 7 F.Supp.2d 1098, 1103 (S.D.Cal.); *aff'd without opinion,* 162 F.3d 1169, 1998 WL 750954 (9th Cir.1998). Under PEI's legal theory, Excite and Netscape would not be permitted to publish advertising that has already been found lawful.

### F. There Is No Evidence of Trademark Dilution

92. Dilution is "the lessening of the capacity of a famous mark to identify and distinguish goods or services." 15 U.S.C. § 1127.

93. "Dilution laws ... are not intended to serve as mere fallback protection for

Here, there is no likelihood of confusion or dilution with any goods and services. PEI never contends that any specific banner advertisement (or the good or product in the banner advertisement) itself infringes or dilutes its marks.

PEI also does not contend that banner advertisements (or the goods or services in the banner advertisement) which are generated randomly when an Internet user searches for "playboy" or "playmate" are infringement or dilution. *See* PEI Proposed Findings F2.

PEI complains only that the "keying" of an advertisement to an Internet user's search for "playboy" or "playmate" is improper. However, the difference between whether a particular banner advertisement is generated .randomly or "keyed" when an Internet user searches for "playboy" or "playmate" has nothing to do with the use of a trademark on a particular good or service.

trademark owners unable to prove trademark infringement." *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 48 (1st Cir.1998); *Ringling Bros.–Barnum & Bailey Combined Shows, Inc. v. Utah Div'n of Travel Dept.*, 170 F.3d at 459 ("we simply cannot believe that... Congress could have intended ...to create property rights in gross, unlimited in time (via injunction)...."); *Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 793 (9th Cir.1981) (refused to give the California dilution statute an overly broad application "lest it swallow up all competition in the claim of protection against trade name infringement").

94. To establish dilution under the Federal Trademark Dilution Act requires proof that: "(1) a defendant has made use of a junior mark sufficiently similar to the famous mark to evoke in a relevant universe of consumers a mental association of the two that (2) has caused (3) actual economic harm to the famous mark's economic value by lessening its former selling power as an advertising agent for its goods and services." *Ringling Bros.*, 170 F.3d 449, 461 (4th Cir.1999) (held, the phrase the "Greatest Snow on Earth" did not dilute plaintiff's mark the "Greatest Show on Earth").[22]

95. The *Ringling Bros.* Court explained how to prove dilution: "Most obviously, but most rarely, there might be proof of an actual loss of revenues, and proof of replicating use as cause by disproving other possible causes. Most obviously relevant, and readily available, is the skillfully constructed consumer survey designed not just to demonstrate 'mental association' of the marks in isolation, but further consumer impressions from which actual harm and cause might rationally be inferred." *Id.*, 170 F.3d at 465.

96. Here, PEI failed to provide *evidence* of dilution by any means.

97. Dilution may occur through blurring or tarnishment, but is not limited to these categories. *See Panavision International, L.P. v. Toeppen*, 141 F.3d 1316, 1326 (9th Cir.1998).

98. Because trademark dilution on the Internet presents novel issues not necessarily addressed in non-Internet judicial decisions. *Panavision*, 141 F.3d at 1318. Therefore, to find dilution in an Internet case, a court need not rely on traditional definitions such a "blurring" and "tarnishment". *Id.* at 1326.

### (1) *There Is No Blurring*

99. Blurring occurs when a defendant uses a plaintiff's trademark to identify the defendant's goods, which severs the unique association between the mark and a single product. *See Panavision International, L.P. v. Toeppen*, 141 F.3d 1316, 1326 n. 7(9th Cir.1998). The legislative history of the Dilution Act provides examples of such blurring: DuPont shoes, Buick aspirin and Kodak pianos. *I.P. Lund Trading*, 163 F.3d at 45.

100. It is hornbook law that defendant must use plaintiff's mark as its own trademark on its goods to cause blurring. *See* Restatement (Third) of Unfair Competition § 25, comment f (1995) ("[F]or such dilution to occur, [it must be the case that] ... a mark associated with plaintiff is now also in use as an identifying symbol of another."); 3 McCarthy on Trademarks and Unfair Competition § 24:103 at 24–188 (4th ed. 1998) ("Dilution by blurring occurs if the defendant uses the word as its own *trademark* for goods that are so different that no confusion of source or sponsorship can occur.").

101. Excite and Netscape have not used PEI's marks to identify goods or services. Therefore, there is no blurring. *See Revlon Consumer Products Corp. v. Jennifer Leather Broadway, Inc.*, 858 F.Supp. 1268, 1277–78 (S.D.N.Y.1994), *aff'd without opinion*, 57 F.3d 1062 (2nd

---

22. The Act requires dilution; There is no remedy for "likelihood of dilution." *Ringling Bros.–Barnum & Bailey Combined Shows, Inc.*

*v. Utah Div'n of Travel Dept.*, 170 F.3d 449, 458 (4th Cir.1999).

Cir.1995) (leather furniture seller's use of the phrase "only Revlon has more colors" did not violate New York dilution statute; defendant did not use plaintiff's mark to identify defendant's goods).

### (2) *There Is No Tarnishment*

102. Tarnishment occurs when a famous mark is improperly associated with an inferior or offensive product or service. *Panavision International, L.P. v. Toeppen,* 141 F.3d 1316, 1326 n.7(9th Cir.1998).

103. PEI argues that because its "marks" are located near materials which it considers more sexually explicit than its material, its "marks" are being tarnished.[23]

104. The factual premise behind PEI's motion is incorrect. PEI uses its marks to sell sexually explicit material and specifically instructs its readers on how to find sexually explicit material. *See Playboy Entertainment Group, Inc. v. U.S.,* 30 F.Supp.2d 702, 707 (D.Del.1998) ("The programming on the Playboy network is virtually 100% sexually explicit adult programming.").

105. Further, PEI sells its goods near the sexually explicit products of others all the time. *See PEI v. Webbworld, Inc.,* 991 F.Supp. 543, 558–59 (N.D.Tex.1997) ("[A PEI employee admitted that] PEI has a wide channel of distribution that includes adult bookstores ... [and] that PEI cannot control where and how its publications ... are displayed... [T]he Court finds no dilution.").

106. In light of the above, there is no tarnishment. *See Ringling Bros.—Barnum & Bailey Combined Shows v. B.E.*

---

23. It is not clear how PEI's theory of "tarnishment" applies to its request for a preliminary injunction. PEI is requesting an injunction which prohibits all keying of any advertising (whether it relates to sexually explicit material or not) to an Internet user's search for "playboy" and "playmate."

24. PEI's cases involving domain names, *see, e.g., Panavision,* 141 F.3d 1316, have nothing to do with the issues in this case. "A significant purpose of a domain name is to identify

*Windows Corp.,* 937 F.Supp. 204, 211 (S.D.N.Y.1996) (no tarnishment where both plaintiff's and defendant's products were sold in similar places).

### (3) *PEI Has Not Shown That Its Marks Have Been Diluted*

107. PEI has failed to produce any evidence that the capacity of its marks to identify and distinguish goods and services has been lessened in any way.

### (4) *PEI Is Not Likely To Prevail On Its Dilution Claims*

108. Because there is no evidence of any lessening (by blurring, tarnishment, or any other means) of the capacity of PEI's marks to identify and distinguish goods and services, PEI has failed to demonstrate a likelihood that it could prevail on the merits of its dilution claims. *See Ringling Bros.–Barnum & Bailey Combined Shows, Inc. v. Utah Div'n of Travel Dept.,* 170 F.3d 449, 458–59 (4th Cir.1999) (plaintiff must provide evidence of dilution).[24]

### G. *PEI Has Not Shown a Likelihood of Success on Its State Law Claims*

109. Because, as shown above, there is no trademark infringement or dilution, PEI has not shown a likelihood of success on its state law claims. *See Bally Total Fitness Holding Corp. v. Faber,* 29 F.Supp.2d 1161, 1168 (C.D.Cal.1998); *Mattel, Inc. v. MCA Records, Inc.,* 28 F.Supp.2d 1120, 1157 (C.D.Cal.1998); *Toho Co., Ltd. v. Sears, Roebuck & Co.,* 645 F.2d 788, 794 (9th Cir.1981).

---

the entity that owns the web site." *Id.,* 141 F.3d at 1327. In contrast, the words "playboy" and "playmate", unattached to PEI's goods and services, are merely words in the English language which PEI does not own.

Other courts have held that domain names are special and such cases are not easily analogous to other situations. *See e.g., Bally Total Fitness Holding Corp. v. Faber,* 29 F.Supp.2d 1161, 1165 & n. 2 (C.D.Cal.1998).

## 1090

### H. There is No Irreparable Harm

110. PEI has not demonstrated a likelihood of confusion or dilution. Therefore, the Court finds that PEI will not suffer any irreparable harm from denial of injunctive relief.

111. PEI's delay in seeking injunctive relief further demonstrates the lack of any irreparable harm. *See, e.g., Stokely–Van Camp, Inc. v. Coca–Cola Co.,* 1987 WL 6300, 2 U.S.P.Q.2d 1225, 1227 (N.D.Ill. 1987) ("the fact the [plaintiff] waited for three months indicates a lack of need for the extraordinary remedy of a preliminary injunction."); *Programmed Tax Systems, Inc. v. Raytheon Co.,* 419 F.Supp. 1251, 1255 (S.D.N.Y.1976) (60–day delay in filing suit; denied preliminary injunction).

### I. The Proposed Injunction Is Improper

112. As discussed above, the Court finds that PEI is not entitled to an injunction.

113. The Court further finds that PEI's proposed injunction is inherently flawed. PEI's proposed injunction would prohibit Excite and Netscape from, among other things, publishing any banner advertisements or directories which are keyed to respond to the entry of "PEI's *trademarks,* Playboy ® or Playmate ® as search terms..." *See* PEI's Proposed Injunction ¶ 1(i).

114. The proposed injunction would bar (a) nothing, because a user cannot enter PEI's trademarks Playboy ® or Playmate ® as search terms, a user only enters words as search terms; or (b) too much, because it would bar all advertising in response to the use of the words "playboy" and "playmate" as search terms, even though PEI does not have a monopoly on the use of those *words.*

### III.

### CONCLUSION

115. PEI has failed to establish either a likelihood of success on the merits or irreparable injury. Therefore, the Motion For Preliminary Injunction is denied.